IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Richard A. Collins, | : | Case No. 1:05CV637 |
| | : | |
| Plaintiff | : | District Judge Susan J. Dlott |
| | : | |
| v. | : | Order Granting in Part and |
| | : | Denying in Part Motion for |
| The United States Playing Card Co., | : | Summary Judgment, and Denying |
| | : | Defendant's Motion to Strike and |
| Defendant. | : | Plaintiff's Motion to Supplement |

This matter is before the Court on Defendant's Motion for Summary Judgment (doc. 20) and Motion to Strike Plaintiff's Errata Sheets and Affidavits Submitted in Opposition to Defendant's Motion for Summary Judgment (doc. 31), which motions Plaintiff opposed (doc. 25; doc. 33).  Also before the Court is Plaintiff's Motion to Supplement Deposition Errata Sheets. (Doc. 34.)

Defendant, the United States Playing Card Company (the "Company"), terminated Collins on March 4, 2005, ending Collins' nearly 35-year employment with the Company. Following his termination, Collins filed this lawsuit alleging race discrimination in violation of federal and Ohio statutes; age discrimination in violation of federal and Ohio statutes and Ohio public policy; and disability discrimination in violation of federal and Ohio statutes.  Collins also alleges the Company wrongfully terminated him in retaliation for his wife's workers compensation claim in violation of Ohio statute and/or public policy and that the Company violated the Family Medical Leave Act, 29 U.S.C. § 2601 et seq. (the "FMLA") by denying him

1

leave to which he was entitled and/or retaliating against him for taking leave.  After the
Company filed its motion to dismiss, Collins voluntarily dismissed his disability discrimination
claims.  (Doc. 25 at 1 n. 1.)  Accordingly, the Court considers the Company's motion as to
Collins' remaining claims.  For the reasons that follow, the Court **GRANTS IN PART** and
**DENIES IN PART** Defendant's motion for summary judgment and **DENIES** Defendant's
motion to strike and Plaintiff's motion to supplement as moot.

I.      **BACKGROUND**

The United States Playing Card Company is a manufacturing company based in
Cincinnati, Ohio, that manufactures, markets, and distributes playing cards, children's card
games, collectible tins, puzzles, and card accessories for personal and commercial use.  Plaintiff
Richard Collins, a 55-year-old African-American, began working for the Company in 1970 as a
floor person in the gilding department.  Over the course of his career, Collins worked in several
different departments at the plant including the gold room, plating and stacking, and paper
converting.  In November 2000, the Company transferred Collins to the shipping department,
where he held the position of shipper until he was terminated in March 2005.  As a shipper,
Collins processed customer orders that had been assembled by the packers, wrapped the orders
in a shrink-wrap machine, and took the orders to the UPS machine or the truck staging area to be
shipped.  Collins worked the first shift (7:00 a.m. until 3:30 p.m.) and had regularly scheduled,
ten-minute breaks at 9:00 a.m., 10:30 a.m., and 2:00 p.m., and a lunch break at 11:40 a.m.  From
the time he started in the shipping department until November 2004, Collins received one, low-
level discipline under the Company's attendance policy.

2

In the spring of 2002, Collins' doctor diagnosed him as a diabetic.  Collins' doctor wrote a note to the Company on April 29, 2002, apprising it of Collins' diabetes.  Collins submitted the note to the Company's human resources department per Company policy.  (Collins decl. ¶ 2, Doc 25, Ex. A.)  Collins takes medication daily to help control his blood sugar levels and carries with him a machine to test his blood sugar.  At times, he has to eat to help keep his blood sugar at normal levels.  (*Id.* at ¶ 3.)

In the summer of 2004, the Company transferred Theresa Shaw into the shipping department as the supervisor, where she supervised approximately 35 employees, including Collins.  According to Shaw, the Company transferred her to the shipping department to correct the high number of back orders and errors with inventory and to increase the organization of the department.  (Shaw dep. 14-15.)  As part of her effort to "clean up the workplace and get everything organized," Shaw told shipping department employees during a shift meeting that they were not to have personal items in the work area.  (*Id*. at 135.)  At another shift meeting, Shaw told the department employees that they were to stay busy and "there's no time to stand around."  (*Id.* at 61-62.)  These requirements were not in writing (*Id*. at 135), but Collins was aware that Shaw expected shipping department employees to work unless they were on break and to not have personal items at their workstations (Collins dep. 200).

In October of 2004, Collins began to have increased trouble with his diabetes.  In Collins' words, he was "bottoming out" more, that is, experiencing more periods of low blood sugar with the accompanying effects of headaches, nausea, and a lack of energy and focus.  (Collins dep. 386, 398.)  Collins normally had to sit down and eat something in order to recover from bottoming out.  (*Id*. at 393, 397-98.)  Collins visited his physician, who gave Collins a note

concerning his need to eat at scheduled times because of his diabetes.  (Collins decl. ¶ 4.)

Collins then submitted the note to the Company's human resources department on November 9

or 10, 2004.  The note stated:

> To whom it may concern:
> Mr. Richard Collins has diabetes and he needs to eat at scheduled
> times.  He may develop low blood sugar symptoms and needs to be
> able to leave work during that time to avoid passing out.
>
> s/ Philip M. Diller, MD, Ph.D

(Collins decl. ¶ 5, Ex. B.)  When Collins presented this note to the Company's human resources

representative, she suggested that he fill out an FMLA form for intermittent leave "because [he]

would have to leave periodically for doctor appointments and be able to have breaks and eat

during [his] breaks or maybe subsequently leave breaks a few minutes early."  (Collins dep.

326.)  Collins took the FMLA form to his doctor, who filled it out to indicate that Collins needed

intermittent leave.  The doctor signed the form and returned it to the Company's human

resources department.  (Collins decl., Ex. C.)  By a form letter dated November 29, 2004, the

Company notified Collins that he was eligible for FMLA intermittent leave, stating: "You

informed us that you need leave to begin on <u>11/3/04</u> and anticipate leave continuing until

<u>Intermittent</u>."  (*Id.*)

   Beginning that same month, Shaw began to issue disciplines, called "Corrective

Actions,"[1]  to Collins at the rate of approximately one per month until his termination on March

---

[1]  The Company has a progressive disciplinary policy called the Corrective Action
Procedure.  (McClure dep. Ex. 2 at 2.26-2.28.)  The Corrective Action Procedure, which
managers are required to follow, consists of a series of four counseling sessions, each of which is
documented and attended by progressively higher levels of management.  (*Id.*)  "Counseling 1"
takes place "[o]nce a problem has been identified, and is of sufficient concern to warrant
Corrective Action" and consists of a discussion between the employee and his or her immediate
supervisor (*Id.*)  If the employee shows no improvement or if the problem reoccurs, a

4, 2005.  On November 23, 2004, Shaw observed a folded-up newspaper at Collins' workstation. (Shaw dep. 133.)  Shaw approached Collins and asked if the newspaper was his.  He said that it was, and he put it away.  Shaw drafted and issued to Collins a Corrective Action Discussion for having a personal item out of his locker during work time.  (Shaw dep. Ex. 3.)

On December 13, 2004, Shaw observed Collins standing in the shipping area leaning on a pallet with his arms folded.  Shaw approached Collins and asked him what he was doing, to which he replied that he was waiting for work.  Collins testified at his deposition that he had just completed a heavy order that required strenuous pulling and that he was tired and out of breath. He also testified that there was no other work ready for him at that moment but that the packers were assembling the next order and he knew it would be ready for him in a few minutes. (Collins dep. 209, 220.)  Shaw told Collins to get to work.  Shaw then drafted and issued to Collins another Corrective Action Discussion, this time for not working during work time. (Shaw dep. Ex. 5.)  Shaw presented the Corrective Action Discussion form to Collins during a meeting between Shaw, Collins, and Shaw's supervisor Ned Finch.

On January 14, 2005, Shaw again disciplined Collins.  This time, the parties dispute the facts of the incident.  Collins claims that his co-worker, Sidney Merritts, brought him a newspaper article to read prior to the beginning of the 7:00 a.m. shift.  The article concerned

_____

"Counseling 2" session takes place between the employee, the employee's immediate supervisor, and the department manager.  (*Id*.)  If "unsatisfactory improvement is made regarding the problem(s) that triggered the prior counseling sessions," the area vice president may initiate a "Counseling 3" session with the employee.  (*Id*.)  If the employee does not improve or resolve the problem after three counseling sessions, the human resources vice president can schedule a "Counseling 4" session, at which time "[t]he employee should be instructed to decide whether or not he or she believes it would be in his or her best interest to resign, whether or not he or she wishes to continue working for the ... Company and commit to a long-term positive improvement."  (*Id*.)  If the employee commits to improve, any subsequent failure to meet job expectations results in immediate termination.  (*Id*.)

Jack Johnson, an African-American boxer.  Merritts brought the article to work because he was on a Company committee to develop a set of African-American hero playing cards, and the article on Johnson was pertinent to the development of these playing cards.  Collins had begun to read the article when Shaw approached him and told him to put the paper away.  Collins explained to Shaw that the article was related to the playing card project.  Nonetheless, Shaw reported the incident to the human resources department and issued Collins another Corrective Action Discussion, this time for reading a newspaper.  (Shaw dep. Ex. 4.)  According to Collins, when Shaw approached him about reading the newspaper, his 7:00 a.m. shift had not yet started.  (Collins dep. 294-95.)  However, Shaw noted in the Corrective Action Discussion form that Collins was reading the paper at "approximately 7:25 a.m."  Shaw presented Collins with the Corrective Action Discussion Form during a meeting with Shaw, Collins, and Company President and Chief Operating Officer Jason Lockwood.

On January 20, 2005, Collins was working in the morning and began to feel himself "bottoming out" due to his diabetes.  Collins testified in his deposition that he knew he needed something to eat, so he left the work area at approximately 8:50 a.m. to go to the cafeteria.  Shaw was in the cafeteria and asked Collins what he was doing there as it was ten minutes before his regularly scheduled break time.  Collins testified that he explained to Shaw that he was taking his break a little early because he was a diabetic, was bottoming out, and needed something to eat.  (Collins dep. 249.)  Shaw in her deposition said that Collins told her he needed to get something to eat because he had forgotten to take his medicine, which had to be taken with food.  (Shaw dep. 178-79.)  Shaw then called Collins into the office of the head of human resources, Jennifer McClure, for disciplinary counseling.  Collins explained to McClure that he had taken

his break early because he needed to get something to eat.  (Shaw dep. 194.)  Collins claims that

he specifically told McClure that he was a diabetic.  (Collins dep. 263.)  McClure reviewed

Collins' prior discipline record and suspended Collins from work for three days.[2]

On February 2, 2005, Collins' wife, Peggy Shelton Collins, who also had worked at the

Company, settled two lawsuits she had brought against the Company arising out of her

employment.  Ms. Collins worked for the Company for approximately seven years.  In

November 2001, she injured her back at work and filed a workers compensation claim based on

the injury.  The Company denied the claim, and litigation between the parties ensued.  In late

2004 and early 2005, Ms. Collins had two lawsuits pending against the Company.  The February

2, 2005 global settlement disposed of both lawsuits.  Included as part of the settlement was a gag

order on Richard Collins for which Ms. Collins would be penalized $3000 for a violation.  (Doc.

25 at 6.)

On March 4, 2005, Collins received what was to be his final discipline at the Company.

It was approaching 10:30 a.m., Collins' break time.  Collins testified that he felt he needed to eat

and waited until the clock in the shipping area read 10:30 to go to the cafeteria to buy food.

(Collins dep. 266-68.)  His co-worker Carla Jones accompanied him.  When Collins and Jones

arrived in the cafeteria, Shaw was there.  Shaw asked Jones what time it was, and Jones

answered that the cafeteria clock read 10:29 but that the clock in the shipping area read 10:30

when they left.  (*Id*. at 266.)  Collins purchased his food and left the cafeteria.  Shaw then

contacted her assistant supervisor Rob Coffey and asked him to help her verify whether the

clocks in the shipping department matched the clock in the cafeteria.  Shaw went to the shipping

---

[2]  The Court's record does not include a written Corrective Action Discussion form for
the January 20, 2005 incident.

department and Coffey went to the cafeteria.  Using their cell phones, Shaw and Coffey reported to each other the time on the clocks in the respective areas and confirmed that the clocks were synchronized.

Two days later, Shaw called Collins again to McClure's office for discipline concerning the March 2 incident.[3]  Collins told McClure that he had waited until the clock in the shipping area read 10:30 a.m. to go on break.  Collins also claims that he told McClure the reason he left the shipping area when he did was because he was diabetic and needed to eat.  (Collins dep. 396 ("And I had mentioned to Jennifer [McClure], I mentioned to her, I said, I'm a diabetic, and that was the reasoning for me leaving, I guess, for that minute that they claimed that I left early for....").)  McClure acknowledged that Collins told her he was a diabetic but claims that Collins told her his medical condition did not require him to leave the shipping area before his scheduled break.  (McClure dep. 160.)  McClure then terminated Collins.  The Company replaced Collins with a younger white male.[4]

## II.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  On a motion for summary judgment, the movant has the burden of showing that no genuine issues of material fact are in dispute, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion.  *Matsushita*

---

[3]   The Court's record does not include a written Corrective Action Discussion form for the March 2, 2005 incident.

[4]   The Company also terminated Sidney Merritts in the early 2005.  Both Collins and Merritts are African-Americans over age 54.  They were replaced by Joe Bauer, age 22, and Walter Cohen, age 48.  (Doc. 25 at 12.)

*Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986). The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). The nonmoving party "must set forth specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The task of the Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. A genuine issue for trial exists when the evidence is not "so one-sided that one party must prevail as a matter of law." *Id.* at 252.

## III. ANALYSIS

To establish a retaliation or discrimination claim, a plaintiff must produce either direct or circumstantial evidence of retaliation or discrimination. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004). Direct evidence is "evidence that proves the existence of a fact without requiring any inferences." *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004). Collins presents no direct evidence that the Company unlawfully discriminated or retaliated against him on any of the alleged bases. Therefore, Collins must make his case with indirect evidence under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*,

411 U.S. 792, 802 (1973).  *See Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1184-85 (6th Cir. 1996).[5]

Under the *McDonnell Douglas* analysis, a plaintiff must first make a prima facie showing on the discrimination or retaliation claim.  If the plaintiff makes such a showing, the burden shifts to the employer to show a nondiscriminatory reason for its employment decision.  *Monette*, 90 F.3d at 1186; *see also Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981).  If the employer satisfies this burden of production, then the plaintiff must prove by a preponderance of the evidence that the employer's proffered reason was not its true reason but was, in fact, a pretext for illegal discrimination or retaliation.  *Burdine*, 450 U.S. at 256.  The plaintiff retains the ultimate burden of persuasion at all times.  *Id.*

Applying this analysis, Collins first must establish the prima facie elements of FMLA retaliation, workers' compensation retaliation, race discrimination, and age discrimination.  The remainder of the burden-shifting test is the same for each of the claims.  That is, if Collins is able to establish a prima facie case on a claim, the burden of production shifts to the Company to provide a legitimate, nondiscriminatory reason for its decision to terminate Collins.  If, on the other hand, Collins fails to establish a predicate fact necessary to create the presumption of unlawful intent, the burden never shifts to the Company.  *Monette*, 90 F.3d  at 1185.  If the Company provides a legitimate, nondiscriminatory explanation for terminating Collins, Collins is then required to establish that the proffered nondiscriminatory reason is a pretext for unlawful discrimination or retaliation.  *Id.* at 1186.

-----

[5]  Collins' FMLA interference claim does not require the Court to apply the *McDonnell Douglas* burden-shifting analysis.  *See Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006); *supra* footnote 6.

A.      **FMLA Interference and Retaliation**

Collins asserts two separate FMLA claims against the Company: that it interfered with

his rights under the FMLA when it denied him intermittent leave on January 20 and March 2,

2005, and that it retaliated against him for attempting to exercise his rights under the FMLA.[6]

The Company argues that Collins' FMLA interference claim must fail because he never

requested leave on the two occasions where he took his break early and, furthermore, that such

breaks are not even protected by the FMLA.  The Company argues that Collins' FMLA

retaliation claim must fail because he cannot establish a causal connection between his use of

FMLA leave and his termination, and because the Company had a legitimate nonretaliatory

reason for terminating Collins.

The FMLA entitles an eligible employee to twelve weeks of leave during any twelve-

month period because of, inter alia, "a serious health condition that makes the employee unable

to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D).  It is

unlawful for an employer to "interfere with, restrain, or deny the exercise of or the attempt to

---

[6] The Sixth Circuit recognizes that subsections (a)(1) and (a)(2) of the statute establish two distinct theories of recovery: those of entitlement (interference) and of retaliation.  *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006).  Under the entitlement theory, "[t]he issue is simply whether the employer provided its employee the entitlements set forth in the FMLA–for example, a twelve-week leave or reinstatement after taking a medical leave."  *Id.* (citing *Arban v. West Pub. Co.*, 345 F.3d 390, 401 (6th Cir. 2003)).  The employer's intent is not a relevant part of the entitlement inquiry under § 2615, and the Court need not apply the *McDonnell Douglas* burden-shifting test in such cases.  *Id.* at 507, 508; *see also Schmauch v. Honda of Am. Mfg. Inc.*, 295 F. Supp. 823, 828-31 (S.D. Ohio 2003).

Under the retaliation theory of recovery, on the other hand, an employer's motive is an integral part of the analysis.  *Edgar*, 443 F.3d at 508 (citing *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 160 (1st Cir. 1998)).  "The employer's motive is relevant because retaliation claims impose liability on employers that act against employees specifically *because* those employees invoked their FMLA rights."  *Id.*  The Sixth Circuit applies the *McDonnell Douglas* burden-shifting test to retaliation claims under the FMLA.  *Id.* (citing *Skrjank v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 313-16 (6th Cir. 2001)).

exercise" its employees' rights under the statute. 29 U.S.C. § 2615(a)(1). The FMLA also prohibits an employer from discharging or in any other manner discriminating against any individual for opposing any practice made unlawful by the FMLA. 29 U.S.C. § 2615(a)(2). An employee need not take FMLA leave all at once but may take leave intermittently. 29 C.F.R. § 825.203. "Intermittent leave is FMLA leave taken in separate blocks of time due to a single qualifying reason," and "[t]here is no limit on the size of an increment of leave when an employee takes intermittent leave." 29 C.F.R. § 825.203(a) and (d).

### 1. Interference

To survive the Company's motion for summary judgment on his FMLA interference claim, Collins must show that: (1) he was an eligible employee, (2) the Company was an employer as defined under the FMLA, (3) he was entitled to leave under the FMLA, (4) he gave the Company notice of his intention to take leave, and (5) the Company denied him FMLA benefits to which he was entitled. *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006) (citing *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005)).

The Company does not dispute the first three prongs of the test. Indeed, the Company expressly told Collins that he was entitled to intermittent FMLA leave by notice dated November 29, 2004. (Collins decl. Ex. C.) Rather, the Company asserts that Collins did not properly give the Company notice of his intention to take FMLA leave on the two occasions where he took his break early in order to get something to eat.

To invoke FMLA protection, the employee must request leave and give the employer notice that he is requesting such leave for a serious health condition that renders him unable to perform his duties. *Brenneman v. Medcentral Health Sys.*, 366 F.3d 412, 421 (6th Cir. 2004)

12

(citing cases).  The notice that an employee is required to give depends on the facts of the

particular case.  29 C.F.R. § 825.303.  When the timing of the need for leave is foreseeable, an

employee must provide the employer at least 30 days advance notice or as soon as practicable.

29 C.F.R. § 825.302.  When the timing of the need for leave is not foreseeable, an employee is

expected to give notice to the employer as soon as practicable.  29 C.F.R. § 825.303.  Regardless

of whether the need for leave is foreseeable, "*[t]he employee need not expressly assert rights*

*under the FMLA* or even mention the FMLA, but may only state that leave is needed."  29 C.F.R.

§§ 825.302, 825.303 (emphasis added).

> Because an employee need not expressly invoke the FMLA, "[t]he
> critical question is whether the information imparted to the employer
> is sufficient to reasonably apprise it of the employee's request to take
> time off for a serious health condition." "[A]n employee gives his
> employer sufficient notice that he is requesting leave for an
> FMLA-qualifying condition when he gives the employer enough
> information for the employer to reasonably conclude that an event
> described in the FMLA § 2612(a)(1) has occurred."

*Cavin v. Honda of America Mfg., Inc.*, 346 F.3d 713, 723-24 (6th Cir. 2003) (internal citations

omitted).

The Company has failed to meet its burden of showing that no genuine issues of material

fact are in dispute with respect to whether Collins gave notice sufficient to invoke FMLA

protection for the two times he left his workstation early to get something to eat.  Collins has

presented the following evidence in support of his position that he gave adequate notice of his

intention to take leave: his physician's notes of April 29, 2002 and November 9, 2004; his

physician's certification form regarding Collins' need for intermittent leave; the Company's

November 29, 2004 form indicating Collins' eligibility for FMLA leave; Collins' testimony that

on January 20, 2005 he informed Shaw that he was a diabetic and was taking his break early in

13

order to get something to eat (Collins dep. at 249); and his testimony that on March 4, 2005 he informed McClure that he was a diabetic and took his break in order to get something to eat (Collins dep. 396).  The Company disputes Collins' testimony that he informed both Shaw and McClure that he was taking breaks in order to eat because of his diabetes.  Whether, in fact, Collins told the Company that he left his workstation on the two dates in question to address his medical condition is material to the resolution of the notice issue.

Neither party has expressed a position on whether Collins' need for leave was foreseeable or unforeseeable.  Regardless of whether Collins' need for leave was foreseeable, the notice issue is not proper for summary judgment in this case.  Assuming the need for leave was foreseeable, Collins gave notice to the Company of his need for intermittent leave on November 10, 2004 at the latest, according to the Company's own document.  (Collins decl. Ex C.)  The event that precipitated Collins' fourth Disciplinary Action for taking his break early occurred on January 20, 2005.  Collins' notice was thus more than 30 days in advance of the date he asserts was his first need for leave.  *See* 29 C.F.R. § 825.302.  Furthermore, when the need for leave is foreseeable, an employee need only give notice one time, even when the leave is to be taken intermittently.  29 C.F.R. § 825.302(a).  Assuming the need for leave was unforeseeable, Collins testified that on January 20, 2005, he told Shaw he was taking his break early to get something to eat because of his diabetes, and he told McClure on March 4, 2005 that he had diabetes as an explanation for his early break time.  If true, these facts could lead a reasonable jury to conclude that Collins gave the Company notice "as soon as practicable." 29 C.F.R. § 825.303.  In cases of unforeseeable leave, the onus is on the employer "to obtain any additional required information through informal means."  29 C.F.R. § 825.303(b).

14

If accepted as true, the facts presented by Collins are sufficient to support a finding that Collins gave the Company enough information for it to reasonably conclude that he was suffering from a serious health condition that made Collins unable to perform the functions of his position such that he was entitled to leave his workstation early on January 20 and March 2, 2005.  *See* 29 U.S.C. § 2612(a)(1)(D).

Having determined that a material fact is in dispute as to whether Collins gave adequate notice of his intent to take leave, the Court need not address the Company's argument with respect to the fifth element of the claim for FMLA interference–whether the Company denied Collins leave to which he was entitled.  However, that the Company disciplined Collins on January 20 and March 4, 2005 demonstrates that they did not grant him FMLA leave for the two incidents in question, notwithstanding Collins' deposition testimony.[7]

The Company argues that even if Collins requested FMLA leave for the times he left his workstation a few minutes early in order to get something to eat, his claim must fail because such brief increments of time (characterized by the Company as "unfettered breaks during the work day") are not protected leave under the FMLA.  The Court disagrees with the Company's characterization of Collins' leaves and with its conclusion.

First,"[t]here is no limit on the size of an increment of leave when an employee takes intermittent leave" under the FMLA.  29 C.F.R. § 825.203(d).   The Company has not directed

---

[7]  During his deposition, Collins testified as follows:
> Q. ...  The fact is the company never denied you any leave that you
> requested under the FMLA for your medical condition, correct?
>     Mr. Kammer: Objection.  Calls for a legal conclusion.
> A.  No, no.
> Q.  What I said is correct?
> A.  True, they never denied me.

(Collins dep. 337-38.)

this Court to any truly analogous binding authority that holds that the Act does not protect intermittent leaves of only a few minutes in duration. Thus, the Court cannot conclude that Collins' leaves of only a few minutes are per se excluded from the Act's protection.[8] The Company relies primarily on two cases as support for its position that Collins' unscheduled breaks were not protected by the FMLA, *Mauder v. Metropolitan Transit Auth*, 446 F.3d 574 (5th Cir. 2006) and *Hensley v. Cooper Standard Automotive*, 2005 WL 1981448 (E.D. Tenn. Aug. 17, 2005). Both of these cases are distinguishable from the instant matter.

In *Mauder*, the plaintiff employee learned he was diabetic while receiving medical treatment for an unrelated condition. *Mauder*, 446 F.3d at 577. When he returned to work, he did *not* notify his employer that he had been diagnosed as having diabetes. *Id*. The insulin drug Mauder's doctor prescribed for him had a side-effect of uncontrollable bowel movements. *Id*. As a result, Mauder made frequent trips to the bathroom that were not always at the scheduled break time. *Id*. Mauder did *not* inform his supervisor of his medical condition until after she emailed him concerning his tardiness in returning from scheduled breaks. *Id*. When his supervisor asked Mauder to provide more information regarding his medical condition, Mauder refused. *Id*. at 578. Several weeks later, Mauder provided his employer with a doctor's note. The note, however, merely stated that the side effects of the medication, like diarrhea, were usually transient and the doctor would try to manage the side effects on Mauder's next office visit. *Id*.

---

[8] Similarly, the court in *Mora v. Chem-Tronics, Inc.*, 16 F. Supp.2d 1192 (S.D. Cal. 1998) found that there was a jury issue where an employee was two minutes late for work for an allegedly FMLA-qualifying reason.

Mauder argued that he should have been given temporary leave under the FMLA to go to the restroom because of his persistent diarrhea. The court acknowledged the "novelty" of Mauder's claim–that he was asking for unfettered permission to take necessary restroom breaks–but ultimately resolved the issue without deciding whether such breaks fell within the ambit of the FMLA. Specifically, the court found that Mauder failed to show that his medical condition left him incapacitated as required by the statute, thus he was not entitled to FMLA leave. *Id*. at 581-81. Furthermore, Mauder failed to provide his employer with the information it requested and which would enable it to process his demands for flexible breaks. *Id.* at 582.

*Mauder* is readily distinguishable from the instant case. Unlike Mauder, Collins provided his employer with information from his doctor clearly explaining that "[Collins] may develop low blood sugar symptoms and need to be able to leave work during that time to avoid passing out." (Collins decl. Ex. B.) Additionally, Collins provided the Company with the Certification of Health Care Provider it requested. Most important, the *Mauder* court did not conclude that the FMLA does not allow for periodic time away from one's workstation. Rather, the *Mauder* court merely expressed in dicta that it had been "unable to locate a case where 'temporary' FMLA leave was awarded in such a context–where the leave given does not constitute time away from work, but merely periodic time away from a desk throughout a work day." *Id*. at 580.

In *Hensley*, the second case on which the Company relies, the plaintiff had undergone rotator cuff surgery and was required to perform 15- to 20-minute physical therapy exercises, which she did each day at work in the first-aid room. 2005 WL 1981448 at *1. The employer then terminated Hensley for allegedly sleeping in the first-aid room. Hensley sued her employer

claiming that it never informed her that intermittent FMLA leave was available and that her termination violated the FMLA.  The court concluded that 15- to 20-minute exercises did not qualify as intermittent leave.  *Id*. at *5.

*Hensley* is distinguishable in several respects.  First, Hensley never applied to her employer for intermittent FMLA leave for her exercises; she did not even know that the FMLA provided protection for intermittent leave.  Second, Hensley did not receive from her employer express notice that she was eligible for intermittent FMLA leave.  Collins, on the other hand, specifically applied for intermittent FMLA leave *at the request of the Company's own human resources representative*.  Further, he received from the Company notification that he was eligible for intermittent FMLA leave due to his medical condition, namely, his need to be able to leave work during periods of low blood sugar to avoid passing out.

The Court finds *Sabbrese v. Lowe's Home Centers, Inc*., 320 F. Supp.2d 311 (W.D. Pa. 2004) to be more analogous to the instant case than either *Mauder* or *Hensley*.  In *Sabbrese*, a diabetic employee brought an action against his former employer alleging that his termination violated the FMLA.  Like Collins, Sabbrese was required to eat at scheduled intervals in order to control his blood sugar.  *Id*. at 313.  One day, Sabbrese began feeling weak, nauseated, and lightheaded.  *Id*. at 314.  Believing that he was going to pass out if he waited any longer to eat, he decided to go to lunch, even though doing so left the department unattended.  *Id*.  Sabbrese was disciplined for leaving the department unattended, and at the disciplinary meeting, Sabbrese made physical contact with the department manager.  Sabbrese was ultimately terminated for making physical contact with the manager.  *Id*. at 317.

The *Sabbrese* court denied the employer's motion for summary judgment after concluding that "leave taken by a diabetic employee in order to eat to correct low blood sugar when medically necessary may qualify as intermittent leave under the FMLA." *Id*. at 322.  The court specifically noted that "[t]he fact that an employee receives daily lunch and other breaks is not dispositive [of whether a lunch break or any other break can qualify as intermittent FMLA leave] because there may be situations, such as the present case, where a diabetic (or otherwise impaired) employee faces a medical emergency and is unable to comply with his employer's break policies, yet still must take unforeseeable intermittent leave." *Id*.

Given the reasoning of *Sabbrese*, the language of the regulation specifying that there is no limit on the size of an increment of intermittent leave, and the evidence in the record concerning Collins' eligibility for intermittent FMLA leave, the Court concludes that Collins is not precluded from pursuing his FMLA interference claim on the basis that the period of time for which he sought leave cannot qualify as intermittent leave under the FMLA.

As its final point on the subject, the Company argues that Collins' breaks did not qualify as intermittent leaves protected by the FMLA because they were not "medically necessary."[9]  As support for this position, the Company notes that Collins testified that he could have carried a small snack in his pocket to eat whenever he felt like he was "bottoming out," thus it was not medically necessary for him to leave his work station whenever he felt hungry.  Collins counters that whether he went to the cafeteria for food or had a snack in the shipping department, he would have had to stop working before his scheduled break to do so.

_____

[9]  "Leave may be taken intermittently ... *when medically necessary* for planned and/or unanticipated medical treatment of a related serious health condition by or under the supervision of a health care provider, or for recovery from treatment or recovery from a serious health condition."  29 C.F.R. § 825.203(c) (emphasis added).

19

The Company requested and received from Collins' doctor a Certification of Health Care Provider concerning Collins' medical condition–namely his need to eat to control his blood sugar.  Based upon that Certification, the Company found that Collins was eligible for intermittent FMLA leave.  This would seem to indicate that the Company agreed that taking a break to eat could be a medical necessity for Collins.  There is therefore a genuine issue of fact as to whether Collins' departure from his work station before his scheduled break time was a medical necessity.  Accordingly, the Court finds that Collins has presented sufficient evidence to survive the Company's motion for summary judgment on his FMLA interference claim.

### 2. Retaliation

To make a prima facie case of retaliation, Collins must show that: (1) he availed himself of a protected right under the FMLA by notifying the Company of his intent to take leave, (2) he suffered an adverse employment action, and (3) there was a causal connection between the exercise of his rights under the FMLA and the adverse employment action.  *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006).  If Collins satisfies these three requirements, the burden shifts to the Company to proffer a legitimate, nondiscriminatory rationale for terminating Collins.  *Id.*

The Company in its motion does not address the first two elements of the test but relies on its argument that there is no causal connection between Collins' use of FMLA leave and his termination.  The Company bases its argument solely on Collins' deposition testimony.  In his deposition, Collins testified as follows:

> Q.  And it also would be accurate that after you took the time that you requested under the Family and Medical Leave Act, you were not penalized for taking that time, correct?
> A.  That's true.

20

* * *

Q.  And you also claim that, in the alternative ... the company retaliated against you for taking FMLA leave?
A.  No.
Q.  They never did that, did they?
A.  No, not as far as I know about.

(Collins dep. 329-30, 338.)  Collins' testimony is not dispositive of whether there was a causal connection between the exercise of his FMLA rights and his termination.  First, Collins testified in his deposition that he took FMLA leave in order to care for his wife and another family member.  (*Id*. at 320, 323.)  Collins also requested time off to go to doctor's appointments.  (*Id*. at 329.)  Collins' testimony that he was not penalized for taking any time away from work when he requested it under the FMLA was in the context of a discussion of these various requests for leave, not the disputed incidents of January 20 and March 2, 2005.

Second, the evidence demonstrates a temporal proximity between the time Collins gave the Company his request for intermittent FMLA leave in November 2004, the onset of Corrective Actions that same month, and his termination in March 2005.  The Sixth Circuit has affirmed that a plaintiff satisfies the third prong of a prima facie case of retaliatory discharge when the plaintiff can present indirect evidence of a causal connection between the exercise of FMLA rights and the adverse employment action because of the proximity in time between the plaintiff's request for leave and his discharge.  *See Skrjanc v. Great Lakes Power Service Co.*, 272 F.3d 309, 314 (6th Cir. 2001).  Collins alleged in his Complaint and has not abandoned his claim that the Company retaliated against him for attempting to exercise his FMLA rights.  The Court will not construe his deposition testimony, particularly in the context in which it was

21

given, as dispositive.[10]  The Company has failed to demonstrate a lack of material fact as to

whether there was a causal connection between Collins' exercise of his rights under the FMLA

and his termination.

Because Collins has made a prima facie showing of impermissible retaliation, the burden

shifts to the Company to "articulate a valid rationale" for his discharge.  *Hartsel v. Keys*, 87 F.3d

795, 800 (6th Cir. 1996).  The Company has asserted that Collins was terminated for

accumulating five levels of progressive discipline in just over three months.[11]  The burden thus

returns to Collins to prove by a preponderance of the evidence "that the legitimate reasons

offered by the employer were not its true reasons, but were a pretext for discrimination." *Texas*

*Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253(1981).  He may refute the Company's

stated reason "by showing that the proffered reason (1) has no basis in fact, (2) did not actually

motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged

conduct." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000).

While the proximity in time between a request for FMLA-protected leave and discharge

is sufficient evidence of a causal connection for purposes of establishing a prima facie case of

---

[10]  The Court's conclusion that Collins' deposition testimony alone is not dispositive of
the issue of causation is supported by *Downs v. AOL Time Warner*, 2006 WL 162563, Case No.
2:03cv1117 (S.D. Ohio, Jan. 20, 2006) (Sargus, J.).  In *Downs*, the court rejected the defendant's
claim that the plaintiff could not show pretext when she answered at her deposition that she had
no facts to dispute the defendant's reason for discharge.  "Whether Plaintiff can establish pretext
must considered [sic] on the record as a whole, not simply from one response Plaintiff gave on
deposition." *Id*. at *9.

[11]  For the purposes of analyzing pretext, the Court assumes without deciding that the five
Corrective Actions issued to Collins were valid.  Collins argues that the final two instances of
discipline arose out of Collins' taking protected FMLA leave and, thus, are not legitimate.  The
Court's assumption is not intended to limit the scope of evidence Collins could present to a trier
of fact concerning the legitimacy of the Corrective Actions.

retaliation, "it is not alone sufficient to establish that an employer's legitimate, non-discriminatory reason for discharge was a pretext." *Heady v. United States Enrichment Corp.*, 2005 WL 1950793, **4 (6th Cir. 2005) (citing *Skrjanc*, 272 F.3d at 317).  However, Collins has presented additional evidence that creates an issue of fact as to whether the Company's stated reason for terminating him was pretextual.  Collins points out that there are fact disputes underlying the circumstances of the January discipline for his reading the Jack Johnson newspaper article and the March discipline for his leaving his workstation two minutes early. Regarding these incidents, Collins asserts, respectively, that he was reading the Jack Johnson article prior to the start of his shift, and that he did not leave the shipping area until the clock read 10:30 a.m., Collins' regularly-scheduled break time.  Whether these facts are true requires a credibility analysis, which is a jury function.  If a jury believes Collins' version of the events, then they could conclude that the Company's basis for terminating Collins had no basis in fact.

Additionally, Collins testified at his deposition that other employees in the shipping department were not disciplined for conduct that was similar to the conduct for which Collins was disciplined, such as having personal items at their workstations, waiting for work, and leaving early for break.  The Company seeks to refute Collins' testimony by submitting as evidence Corrective Action Discussion forms that show Shaw disciplined other shipping department employees for similar conduct.  (Veissman Affidavit (attached to Doc. 20) Ex. B.) Collins argues that these forms do not rebut Collins' testimony that many violations of Company policy passed without discipline.  Additionally, of the fifteen Corrective Action writeups attached in support of the Company's motion, only six occurred prior to the date of Collins' termination (which Collins suggests demonstrates the Company's efforts to "pad[] files to

23

enhance their legal standing"), and two of those six pertained to the exact same incident for which Collins was disciplined.[12]

Finally, Collins has presented facts that could lead a jury to conclude that the Company did not follow its own disciplinary procedure when it terminated Collins. "An employer's failure to follow a policy that is related to termination or demotion can constitute relevant evidence of pretext." *DeBoer v. Musashi Auto Parts, Inc.*, 124 Fed. Appx. 387, 394, 2005 WL 434526 (6th Cir. Feb. 25, 2005) (citing *Skalka v. Fernald Environmental Restoration Management. Corp.*, 178 F.3d 414, 421-22 (6th Cir. 1999)); *see also Wells v. New Cherokee*, 58 F.3d 233, 236 (6th Cir. 1995).[13] The Company's Corrective Action Procedures set forth a five-step process: four levels of counseling and then termination. (McClure dep. Ex. 2, pp. 2.26-2.27.) The policy is premised upon increased discipline for the same type of offense. ("Once *a problem* has been identified.... [I]f *the problem* reoccurs...." *Id.*) The Company disciplined Collins for the following reasons: (1) having a personal item at his workspace, (2) not working during work time, (3) not working and/or having a personal item at his workspace, (4) starting break early, and (5) starting break early. (Shaw dep. Ex. 6.) Assuming that starting break early

_____

[12] One of the writeups was issued to Sidney Merritts regarding the January 13, 2005 incident concerning the Jack Johnson newspaper article; another was issued to Carla Jones regarding the March 3, 2005 incident in which Jones and Collins allegedly left for break two minutes early.

[13] The Company cites *Williams v. Columbus Metro. Housing Auth.*, 90 Fed. Appx. 870 (6th Cir. 2004) as support for its position that a company's failure to follow its own disciplinary procedures is not evidence of pretext. *Williams* states: "Generally, an employer's failure to follow its own regulations and procedures, *alone*, is not sufficient to support a finding of pretext." *Id.* at 876 (emphasis added). *Williams* does not hold that a company's failure to follow its own disciplinary procedures cannot be considered as evidence of pretext.

24

is the same problem as not working during work time, by the Company's own documentation, Collins was disciplined four times for this problem, not five.[14]

In combination, the temporal proximity between Collins' exercise of his FMLA rights and his termination, Collins' allegations that others were not disciplined for similar conduct, and Collins' allegation that the Company did not follow its Corrective Action Procedure could lead a jury to reasonably conclude that the Company's asserted legitimate reason did not actually motivate the decision to terminate Collins. *White v. Burlington Northern & Santa Fe R. Co.*, 364 F.3d 789, 804 (6th Cir. 2004). Construing the evidence in a light most favorable to Collins, as it must do at this stage of the proceedings, the Court finds that he has presented evidence sufficient to create a genuine issue of material fact that the Company's proffered reasons did not actually motivate the decision to terminate him, were insufficient to motivate the decision to terminate him, or had no basis in fact.

### B.  Workers' Compensation Retaliation

Collins claims that the Company terminated him to get back at his wife for filing and pursuing a claim for workers' compensation, and that this violates Ohio Rev. Code § 4123.90 and/or the public policy of Ohio.[15] The Company argues that Collins' statutory claim fails as a matter of law because to make a prima facie case of retaliation under § 4123.90, a plaintiff must

---

[14]  Shaw stated in her depositions with respect to the first Corrective Action Discussion that Collins was not reading the newspaper but had it folded up at his workstation. (Shaw dep. at 132-33.) Thus, this first discipline cannot be construed as one for not working.

[15]  Ohio Rev. Code § 4123.90 provides that "[n]o employer shall discharge, demote, reassign, or take any punitive action against any employee because the employee filed a claim or instituted, pursued or testified in any proceedings under the workers' compensation act for an injury or occupational disease which occurred in the course of and arising out of his employment with that employer."

show that (1) *he* sustained an injury on the job; (2) *he* filed a workers' compensation claim; and (3) *his* discharge was in contravention of R.C. § 4123.90.  *Herron v. DTJ Ents., Inc.*, 2006 WL 544499, 2006-Ohio-1040 at ¶ 16 (Ohio Ct. App. March 8, 2006) (emphasis added).  The Company also argues that Collins' public policy claim fails because Ohio courts have rejected a common-law public policy claim based on Ohio Rev. Code § 4123.90.

### 1. Statutory Claim

Collins concedes that "a strict reading of R.C. § 4123.90 does not seem to encompass Plaintiff's claim."  (Doc. 25 at 27.)  However, he argues that § 4123.90 is a remedial statute, that remedial statutes should be construed liberally to promote their object, and that federal courts have construed other remedial statutes such as Title VII as allowing claims involving associational retaliation.  The Company counters that Collins has not identified a single case in Ohio that has recognized an associational retaliation claim under § 4123.90.  Further, the Company argues that even if Collins could set forth a prima facie case of workers' compensation retaliation, his claim would fail because there is no evidence of causation and because Collins cannot rebut the Company's legitimate, non-discriminatory reason for terminating him.

Collins' theory of recovery under § 4123.90 is, indeed, novel.  This Court has supplemental jurisdiction over Collins' claims arising under Ohio law pursuant to 28 U.S.C. § 1367.  In deciding supplemental jurisdiction claims, state substantive law provides the rules of decision.  28 U.S.C. § 1652; *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938).  In applying state law, the Sixth Circuit follows the law of the state as announced by the state's supreme court.  *Ray Industries, Inc. v. Liberty Mut. Ins. Co.*, 974 F.2d 754, 758 (6th Cir. 1992).  When the state's highest court has not decided the applicable law, the federal court must ascertain the state

law from "all relevant data," including state appellate court decisions, supreme court dicta, restatements of law, law review commentaries, and the majority rule among other states. *Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F.3d 1126, 1130 (6th Cir. 1995). The Ohio Supreme Court has not decided the issue, and Collins fails to direct this Court to any state appellate decision,[16] supreme court dicta, restatement, or any other source that addresses the issue of whether anyone other than the worker who filed the workers' compensation claim can bring a claim of wrongful discharge in violation of § 4123.90.

Despite the lack of Ohio authority holding that a worker is entitled to pursue a retaliation claim under § 4123.90 when a family member files for workers' compensation benefits, Collins argues that such an interpretation is proper because § 4123.90 is to be "liberally construed in favor of employees." Ohio Rev. Code § 4123.95. Collins also relies on an Ohio Supreme Court case that discusses generally the policy behind the workers' compensation statute:

> The basic purpose of any antiretaliation statute is to enable employees to freely exercise their rights without fear of retribution from their employers. The recognition of a public-policy exception for wrongful discharge in retaliation for filing a workers' compensation claim, whether derived from statutory or common law, is built on the premise that "[i]nability to challenge retaliatory discharges would undermine the purpose of the workers' compensation statute by forcing the employee to choose between applying for the benefits to which he is entitled and losing his job." 82 American Jurisprudence 2d (2003) 682-683, Wrongful Discharge, Section 93.

---

[16] Collins directs the court to two unpublished Ohio appellate cases where the court, without analysis, allowed claims involving associational retaliation for violations of Ohio Rev. Code § 4112.02 to go to a jury: *Wittman v. City of Akron*, 2003 WL 22399742 (Ohio App. 9 Dist.), 2003 -Ohio- 5617, and *Smith v. Friendship Village*, no. 99AP-1332 (Franklin Cty App., June 29, 2000.) The Court can find nothing in these cases to assist it in determining how the Ohio Supreme Court would address a claim of associational retaliation in the context of Ohio Rev. Code § 4123.90.

*Coolidge v. Riverdale Local School District*, 100 Ohio St.3d, 141, 149, 797 N.E.2d 61 (2003)

(determining that an employee receiving temporary total disability compensation could not be

discharged solely on the basis of absenteeism when the absence is directly related to an allowed

condition.)  In *Coolidge*, the court determined that because the workers' compensation statute

was "designed to provide the injured worker with the necessary means to subsist during a period

of TTD, it would be inconsistent to allow the employer to fire such a worker solely because of

the disability for which the employee is being compensated."  *Id*. at 150.  While the *Coolidge*

opinion is illustrative of the public policy against retaliation for filing a workers' compensation

claim, the issue the court considered is not analogous to the issue herein.

The Court recognizes that federal courts construing federal antiretaliation statutes have

held that an employee's allegation of reprisal for a relative's antidiscrimination activities states a

claim upon which relief can be granted.[17]  However, notwithstanding the similarities between the

language of and intent behind Title VII and § 4123.90, the Court is unable to conclude from the

authority cited by Collins that the Ohio Supreme Court would permit a discharged employee to

pursue a claim under § 4123.90 when the employee's wife, not the employee, had filed a

workers' compensation claim.  The Court thus grants the Company's motion for summary

judgment on Collins' claim under Ohio Revised Code § 4123.90.

---

[17]  *See, e.g., EEOC v. Ohio Edison Co.*, 7 F.3d 541 (6th Cir. 1993) (holding that the Title VII section prohibiting discrimination by an employer against an employee because the employee has "opposed any practice" should be broadly construed to include a claim in which the employee's representative has opposed any unlawful employment practice); *DeMedina v. Reinhardt*, 444 F. Supp. 573 (D.C. 1978) (holding that plaintiff's allegations of reprisal for her husband's anti-discrimination activities stated a claim under Title VII); *Johnson v. University of Cincinnati*, 215 F.3d 561, 580 (6th Cir. 2000) ("Moreover, the person claiming retaliation need not be the person who engaged in the opposition, such that 'Title VII ... prohibit[s] retaliation against someone so closely related to or associated with the person exercising his or her statutory rights that it would discourage that person from pursuing those rights.'")

### 2.    Ohio Public Policy Claim

The Ohio Supreme Court has recognized that public policy warrants an exception to the employment-at-will doctrine under certain circumstances. *See Greely v. Miami Valley Maintenance Contractors, Inc.*, 49 Ohio St.3d 228, 551 N.E.2d 981 (1990). To succeed on a wrongful discharge claim in violation of public policy under Ohio law, a plaintiff must show that (1) a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element); (2) that dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element); (3) the plaintiff's dismissal was motivated by conduct related to the public policy (the causation element); and (4) the employer lacked overriding legitimate business justification for the dismissal (the overriding justification element). *Parry v. Mohawk Motors of Michigan, Inc.,* 236 F.3d 299, 311 (6th Cir. 2000) (citing *Painter v. Graley*, 70 Ohio St.3d 377, n. 8, 639 N.E.2d 51 (1994)). The clarity and jeopardy elements of the tort of wrongful discharge are questions of law to be determined by the court. *Collins v. Rizhana*, 73 Ohio St.3d 65, 70, 652 N.E.2d 653 (1995).

Whether a plaintiff is entitled to pursue a wrongful discharge claim often comes down to the application of the jeopardy element of the claim. Under Ohio law, to prove the jeopardy prong of the public policy inquiry, a plaintiff must show that there is no other recourse or adequate remedy available to him:

> An analysis of the jeopardy element necessarily involves inquiring into the existence of any alternative means of promoting the particular public policy to be vindicated by a common-law wrongful-discharge claim.... Simply put, there is no need to recognize a common-law action for wrongful discharge if there

> already exists a statutory remedy that adequately protects society's
> interests.

*Wiles v. Medina Auto Parts*, 96 Ohio St.3d 240, 244, 773 N.E.2d 526 (2002) (internal citations omitted) (holding that a violation of the FMLA does not constitute a violation of Ohio public policy because the compensatory damages and equitable remedies afforded by the FMLA provide a remedy adequate to protect the public policy embodied by the Act).

      The Ohio Supreme Court has not addressed whether the policy embodied in Ohio Workers' Compensation Act gives rise to a common-law claim for wrongful discharge. However, several Ohio appellate courts have considered the issue and recognized a common-law wrongful discharge action based on a violation of public policy established in the workers' compensation statutes. *See, e.g., Sidenstricker v. Miller Pavement Maint., Inc.*, 158 Ohio App.3d 356, 815 N.E.2d 736, 741 (2004); *Limbacher v. Penn-Ohio Coal Co.*, 2002-Ohio-2870, 2002 WL 1232935, at *5 (Ohio App. May 31, 2002); *Hildebrecht v. Premier Machine Products, Inc.*, 2001-Ohio-8805, 2001 WL 1497195 at *1-3 (Ohio App. Nov. 21, 2001); *Kent v. Chester Labs, Inc.*, 144 Ohio App.3d 587, 761 N.E.2d 60 (2001); *Boyd v. Winton Hills Med. & Health Ctr., Inc.*, 133 Ohio App.3d 150, 144, 727 N.E.2d 137 (1999); *Rauhuff v. American Fan Co.*, No. CA98-09-188, 1999 WL 527783, at *6-7 (Ohio App. June 21, 1999). There is at least one contrary decisions from an Ohio appellate court. *See*, *e.g.*, *Coon v. Technical Const. Specialties*, 2005-Ohio-4080, 2005 WL 1875811 (Ohio App. Aug. 10, 2005) (rejecting a common-law public policy claim based on § 4123.90).

      Several district courts in this Circuit have analyzed the Ohio appellate court case law on the subject and have concluded that a plaintiff may pursue a common-law wrongful discharge claim premised on a violation of Ohio Rev. Code § 4123.90. *See, e.g.*, *Hall v. ITT Automotive*,

362 F.Supp.2d 952 (N.D. Ohio 2005); *Simmons v. Wal-Mart Assoc., Inc.*, No. 2:04-CV-51, 2005

WL 1684002 (S.D. Ohio, July 19, 2005); *Welty v. Honda of America Mfg., Inc.*, 411 F.Supp.2d

824 (S.D. Ohio 2005); *Sayler v. Honda of America Mfg., Inc.*, No. 2:04-CV-988, 2005 WL

2338786 (S.D. Ohio 2005).  To the contrary, in an unpublished decision, the Sixth Circuit Court

of Appeals held that an employee's proper recourse for an alleged retaliatory discharge for filing

a workers' compensation claim was to bring a cause of action under the statute, not a public

policy claim.  *Jakischa v. Central Parcel Express*, No. 03-3976, 2004 WL 1987131 (6th Cir.

2004).  However, unpublished opinions of the Sixth Circuit are not binding authority.  *Harper v.

AutoAlliance Int'l, Inc.*, 392 F.3d 195, 205 n. 3 (6th Cir. 2004).

        The Court is persuaded by the cases that hold that a plaintiff may pursue a common-law

wrongful discharge claim premised on a violation of Ohio Rev. Code § 4123.90.  Examining the

first prong of the analysis, the Court finds that there is a clear public policy in Ohio against

terminating an employee in retaliation for an employee's exercise of the right to file a claim

under the workers' compensation act.  This public policy is expressed not only in Rev. Code §

4123.90 but also in *Coolidge v. Riverdale Local School Dist.*, 100 Ohio St.3d 141 (2003).

Specifically, the Ohio Supreme Court in *Coolidge* explained that "[t]he recognition of a public-

policy exception for wrongful discharge in retaliation for filing a workers' compensation claim,

*whether derived from statutory or common law*, is built on the premise that '[i]nability to

challenge retaliatory discharges would undermine the purpose of the workers' compensation

statute by forcing the employee to choose between applying for the benefits to which he is

entitled and losing his job." *Id*. at 149 (emphasis added).  Unlike the statute itself, which appears

to limit the cause of action to the employee who filed a workers' compensation claim, the public

31

policy recognizing a claim for wrongful discharge in retaliation for filing a workers'
compensation claim is not so narrow. As the *Coolidge* court notes, "[t]he basic purpose of any
antiretaliation statute is to enable employees to freely exercise their rights without fear of
retribution from their employers." *Id.* If an employer was permitted to retaliate against an
employee because someone closely related to that employee exercised her rights under the
workers' compensation statute, it would frustrate the public policy of preventing retaliation for
an employee's exercise of her rights under the statute. *See*, *e.g.*, *E.E.O.C. v. Ohio Edison Co.* 7
F.3d 541, 545 (6th Cir. 1993) (finding that Title VII should be broadly construed to include a
claim in which the employee's representative has opposed any unlawful employment practice
and that failure to do so would frustrate the purpose of the statute).

      Furthermore, with respect to the jeopardy prong of the analysis, the Court finds that the
statutory remedy embodied in Code § 4123.90 is not adequate to protect the public policy
prohibiting retaliatory discharge in the context of this case in particular. The statute does not
afford Collins an adequate remedy because it limits recovery to an employee who is subject to
retaliatory action because of his *own* workers' compensation claim.

      Finally, Ohio appellate courts hold that any claim for wrongful discharge in retaliation
for filing workers' compensation claims must be brought pursuant to and in compliance with the
time requirements set forth in Code § 4123.90. *See Stephenson v. Yellow Freight Systems, Inc.*,
No. 99AP-77, 1999 WL 969817, *5 (Ohio App. Oct. 26, 1999). Specifically, under the statute,
the employee must file the action within one hundred eight days immediately following the
discharge, and the employer must receive written notice of a claimed violation within ninety
days following the discharge. Ohio Rev. Code § 4123.90. Collins satisfied these requirements,

sending notice to the Company of the claimed violation on May 26, 2005 (Collins decl. Ex. G) and filing the lawsuit in the Hamilton County Court of Common Pleas on August 30, 2005.

The Company's motion for summary judgment on Collins' common-law claim for wrongful discharge premised on workers' compensation retaliation relies solely on its argument that Ohio courts do not recognize such a claim.  Having concluded that Ohio courts do recognize such a claim and that the statutory remedy is not adequate under the facts presented herein, the Court denies the Company's motion for summary judgment on Collins' claim for wrongful discharge in violation of Ohio's public policy against workers' compensation retaliation.

### C.    Age Discrimination

#### 1.    Statutory Claims

The Company assumes for the purpose of its motion that Collins can establish a prima facie case of age discrimination under the ADEA and Ohio Rev. Code § 4112 and argues that Collins' claim fails nonetheless because, under the *McDonnell Douglas* burden-shifting analysis, he cannot overcome the Company's legitimate nondiscriminatory reason for his termination. The Company refers to Collins' deposition testimony in which Collins admits that he has no facts to prove that the Company's stated reasons for disciplining him were not the real reason. (Collins dep. 291, 292-93, 297, 301, 337, 344-45.)

The Court incorporates herein its discussion concerning pretext as set forth in infra Section A.2. concerning Collins' FMLA retaliation claim.  There are genuine issues of fact concerning whether other employees were consistently disciplined for similar conduct and whether the Company followed its own Corrective Action Procedure when it terminated Collins. Accordingly the Court concludes that, notwithstanding Collins' deposition testimony, he has

presented evidence sufficient to create a genuine issue of material fact that the Company's proffered reasons did not actually motivate the decision to terminate him, were insufficient to motivate the decision to terminate him, or had no basis in fact.  The Court denies the Company's motion for summary judgment on Collins' statutory age discrimination claims.

### 2.      Ohio Public Policy Claim

To reiterate, to succeed on a wrongful discharge claim in violation of public policy under Ohio law, a plaintiff must show that (1) a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element); (2) that dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element); (3) the plaintiff's dismissal was motivated by conduct related to the public policy (the causation element); and (4) the employer lacked overriding legitimate business justification for the dismissal (the overriding justification element).  *Parry v. Mohawk Motors of Michigan, Inc.,* 236 F.3d 299, 311 (6th Cir. 2000) (citing *Painter v. Graley*, 70 Ohio St.3d 377, n. 8, 639 N.E.2d 51 (1994)).  Both the Age Discrimination in Employment Act and Ohio Revised Code § 4112.02(N) are statutes evidencing a clear public policy against discharging an employee on the basis of the employee's age.  Thus, Collins has satisfied the first prong of the analysis.  However, under the law of the Sixth Circuit and this District in particular, Collins has not proved the second prong of the analysis, that the Company's  dismissing him under the circumstances jeopardized the public policy against age discrimination.

The Ohio Supreme Court has not addressed whether Ohio Rev. Code Chapter 4112 provides a sufficient remedy such that it forecloses a public policy claim based on age

34

discrimination.  However, the Sixth Circuit has held that when a plaintiff has a remedy available to him under Chapter 4112, that plaintiff cannot have the same claim under Ohio common law. *Carrasco v. NOAMTC Inc.*, 124 Fed. Appx. 297, 304, 2004 WL 2756838 (6th Cir. 2004) (unpublished opinion).  Numerous courts in this Circuit have relied on *Carrasco* and the Ohio Supreme Court's decision in *Wiles v. Medina Auto Parts*, 96 Ohio St.3d 240, to dismiss public policy claims in age discrimination suits.  *See Feichtner v. Roman Catholic Archdiocese of Cincinnati*, No. 1:05-CV-00398, 2006 WL 571962 (S.D. Ohio Mar. 7, 2006) (Spiegel, S.J.); *Williams v. Allstate Ins. Co.*, No. 5:04-CV-2435, 2005 WL 1315756 (N.D. Ohio June 2, 2005) (Nugent, J.); *Curry v. Consolidated Coal Co.*, No. C203-CV-1053, 2005 WL 1159410 (S.D. Ohio May 17, 2005) (Frost, J.).  The Court agrees with other courts in this Circuit that the broad scope of remedies available under Ohio Revised Code Chapter 4112 is sufficient to vindicate Ohio's public policy against age discrimination and thus forecloses a separate cause of action for violation of public policy.  Accordingly, the Court grants the Company's motion on Collins' common-law wrongful discharge claim based on age discrimination.

### D.    Race Discrimination

The Company assumes for the purposes of its motion that Collins can establish a prima facie case of race discrimination under Title VII and Ohio Rev. Code § 4112 and argues that Collins' claim fails nonetheless because, under the *McDonnell Douglas* burden-shifting analysis, he cannot overcome the Company's legitimate nondiscriminatory reason for his termination. The Company refers to Collins' deposition testimony in which Collins admits that he has no facts to prove that the Company's stated reasons for disciplining him were not the real reason. (Collins dep. 291, 292-93, 297, 301, 337, 344-45.)

The Court incorporates herein its discussion concerning pretext as set forth in infra Section A.2. concerning Collins' FMLA retaliation claim.  There are genuine issues of fact concerning whether other employees were consistently disciplined for similar conduct and whether the Company followed its own Corrective Action Procedure when it terminated Collins. Accordingly the Court concludes that, notwithstanding Collins' deposition testimony, he has presented evidence sufficient to create a genuine issue of material fact that the Company's proffered reasons did not actually motivate the decision to terminate him, were insufficient to motivate the decision to terminate him, or had no basis in fact.  The Court denies the Company's motion for summary judgment on Collins' race discrimination claims.

## IV.  DEFENDANT'S MOTION TO STRIKE AND PLAINTIFF'S MOTION TO SUPPLEMENT

Contemporaneous with its Reply Memorandum in Support of its Motion for Summary Judgment, the Company made a motion to strike Collins' deposition errata sheets and portions of affidavits submitted in opposition to Defendant's motion for summary judgment.  Specifically, the Company moved to strike the following: "[1] changes listed on the errata sheet attached to Plaintiff's deposition transcript which fail to comply with Federal Rule of Civil Procedure 30(e); and, [2] paragraphs in the Declarations of Plaintiff, Francis Williams and Sidney Merritts that fail to comply with Federal Rules of Civil Procedure 56(e) and applicable Rules of Evidence." (Doc. 31 at 1.)  Plaintiff opposed the motion to strike (doc. 33) and simultaneously filed a motion to supplement Collins' deposition errata sheets to bring them into compliance with Civil Rule 30(e).  (Doc. 34.)  In rendering its decision on the motion for summary judgment, the Court did not consider Collins' deposition errata sheet or the portions of the declarations challenged by the

Company.  Therefore, Defendant's motion to strike and Plaintiff's motion to supplement are denied as moot.

## V.        CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for Summary Judgment. (Doc. 20).  The Court **GRANTS** summary judgment in favor of Defendant on Plaintiff's workers' compensation retaliation claim brought pursuant to Ohio Rev. Code § 4123.90 and common-law wrongful discharge claim based on age discrimination in violation of Ohio public policy; **DENIES** Defendant's motion for summary judgment as to all other claims; and **DENIES** Defendant's motion to strike and Plaintiff's motion to supplement as moot.

IT IS SO ORDERED.


_____s/Susan J. Dlott_____
Susan J. Dlott
United States District Judge